## No. 19,756.

CORNELIUS JOSEPH CRUZ *v*. PEOPLE OF THE STATE
OF COLORADO.
(364 P. [2d] 561)

Decided August 28, 1961.   Rehearing denied September 18, 1961.

Plaintiff in error, pro se.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. J. F. BRAUER, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE MCWILLIAMS delivered the opinion of the Court.

CORNELIUS Joseph Cruz was jointly charged with his brothers, Raul Leopoldo Cruz and Thomas Cruz, and one Edward Rudy Vigil, with so-called aggravated robbery and conspiracy to commit the same. Each of the four defendants pled not guilty, and the one defendant, Cornelius Cruz, entered an additional plea of "not guilty by reason of insanity at the time of the alleged commission of the crime," as provided in C.R.S '53 (Supp.) 39-8-1. Pursuant to C.R.S. '53, 39-8-2, this defendant was forthwith committed to Colorado Psychopathic Hospital in Denver to be examined on an out-patient basis by a specialist in mental disease. In due time the examining doctor reported that in his opinion defendant was sane. Disappointed in the result of this examination, defendant through his court appointed counsel petitioned the court to commit him to the Colorado State Hospital at Pueblo for further mental examination. The court granted this petition and he was then transferred to the Colorado State Hospital. Defendant did not await the result of this examination, but promptly escaped from the hospital and remained at large for several months.

Before defendant was recaptured, the other three defendants, namely Raul Cruz, Thomas Cruz and Edward Vigil, were tried and convicted of both aggravated robbery and conspiracy to commit the same, and each sentenced to a term in the state penitentiary.

Upon recapture Cornelius Cruz was returned to the

hospital where the interrupted mental examination was finally concluded. By letter the examining doctor at the hospital stated that in his opinion the defendant was sane.

Upon trial by jury defendant was convicted on the one count of aggravated robbery, the district attorney at the conclusion of all the evidence having voluntarily withdrawn the charge of conspiracy. In his motion for a new trial the defendant urged that the trial court erred in the following particulars only: (1) in refusing to strike the testimony of the witnesses Krupa, Ekler, and Wilkerson as to their very limited conversation with the robbers, because this "defendant was never identified" as having robbed this store and therefore such testimony was hearsay as to defendant; (2) in overruling defendant's objection to instruction No. 11, concerning the effect of recent and unexplained possession of stolen goods, "because this instruction is not proper in a trial for robbery"; (3) in overruling defendant's objection to instruction No. 9 on accessory, "because no evidence was offered to show the defendant had any knowledge of the commission of the robbery"; and (4) "in denying the defendant's motion to direct a verdict of acquittal, because the defendant was not identified as the assailant." The motion for a new trial was denied and defendant was sentenced to a term in the state penitentiary. By the present writ of error the one defendant, Cornelius Cruz, seeks reversal of the judgment and sentence.

Permeating the motion for a new trial and the assignment of error here is the contention and apparent belief of defendant that there is absolutely no evidence of any type linking him to the robbery. In this he is mistaken. In order to demonstrate that there is really *much* evidence, both direct and circumstantial, tying this particular defendant to the robbery, it is necessary to review the evidence in some detail.

On February 28, 1959, at about 9 o'clock A.M., two

gunmen entered the Lake Shore Super Market and announced to all that "this is a stick-up." Each of the robbers was wearing the traditional disguise of a handkerchief over a part of the face, supplmented by the use of false sideburns and a liberal application of mascara. One of the robbers, aided by a pointed gun, escorted some eight customers and three or four employees to the rear of the market and ordered all to lie on the floor behind the meat counter. The other gunman ordered Krupa, the manager of the market, to deposit the money from the four cash registers in a paper sack. When this was accomplished, Krupa was also directed to the rear of the store and all were then moved into the cooler. Moments later the robbers returned to the cooler and ordered Krupa to the front of the store and directed him to open the safe. This was done, and additional money was given the robbers. Krupa was then put back in the cooler and all persons were warned not to leave the cooler or call police for five minutes.

Wilkerson, who was a customer in the market at the time of the robbery, left the cooler very shortly after the robbers fled. In his automobile Wilkerson pursued what he initially believed was the get-away car. Soon being convinced that he was following the wrong car, he eventually gave up the chase, but continued to scour the neighborhood. While thus checking the neighborhood he noticed two men, that he felt resembled the gunmen, enter a house situate at 1546 King St. He reported this information to the police who immediately converged on the house.

Officer Rudman knocked on the front door at 1546 King Street and was admitted by a young girl. As Rudman entered he first noticed Vigil coming into the front room from the rear bedroom. Vigil was arrested and Rudman next noticed Tommy Cruz enter the bathroom. The bathroom door was then either locked or secured by the placing of a foot against the door. After some effort on the part of Rudman the door opened and Tommy Cruz

was arrested. Search of the bathroom disclosed twenty-five $1.00 bills recovered from the bathroom floor, along with several dish coupons bearing the name "Lake Shore Super Market." These coupons were identified by Krupa as having been taken from his store in the robbery.

Raul Cruz was shortly thereafter arrested in the rear bedroom. Search of this rear bedroom disclosed a sports jacket lying on the floor of the closet. In this jacket there was a large amount of currency of various denominations, much of it in bundles with a slip of paper attached to each, these slips bearing the lettering "OK MK." In this connection Krupa testified that after he picked up money from the bank it was his custom to count the money and if his tally checked with that of the bank, he would note: "OK MK," and he identified this particular initialling as his. Also in this sports jacket were found two wallets, one belonging to Raul Cruz and the other to Cornelius Cruz.

Raul and Thomas Cruz, along with Vigil, were then taken to police headquarters. Detectives Grace and Snyder thereafter proceeded to make a systematic search of the entire house. It was noted that a trap door in the ceiling of a hallway had the appearance of having been recently moved. A search of the attic followed and defendant Cornelius Cruz was discovered, hiding under some insulation. Also found in the attic were the two guns, which upon trial were identified as the ones used in the robbery of the Lake Shore Super Market, some shells and a paper sack containing a quantity of currency and coin.

When first questioned Cornelius Cruz denied any knowledge of, or participation in, the robbery of the Lake Shore Super Market. Later the same day he indicated a willingness to talk about the robbery and, according to Detective Grace, said: "You bring Eddie [Vigil] down and we'll cop out on this." Vigil was brought into the interviewing room, and Detective Grace testified that Cornelius Cruz said: "We put the people in

the cooler. I made them open the safe. We parked along-
side in a Mercury sedan." To which Vigil reportedly
replied: "That's right. Corny and I did it. We went in.
* * * " Detective Grace further testified that defendant
refused to sign a written confession, and on the follow-
ing day said that he would "not cop out on this job unless
I can clear my brothers." Upon trial defendant took the
witness stand and denied any participation in the rob-
bery, gratuitously testifying that his two brothers and
Vigil, who had already been convicted, committed the
robbery. However, he did admit telling Detective Grace
that he and Vigil "pulled the job," but said this was not
the truth and that he made the false statement in an ef-
fort to protect his brothers.

The primary issue to be resolved is whether there
is sufficient evidence linking this defendant to the rob-
bery to warrant submission of the case to the jury. We
hold that there is. Defendant's principal contention in
this regard is that neither Krupa, the store manager, nor
Ekler, an employee, nor Wilkerson, a customer, could
positively identify him as one of the two robbers, and
that such being the case the trial court was required to
direct a verdict of not guilty. It should be remembered
that the robbers were in rather elaborate disguise. At
the trial several witnesses testified that Cornelius Cruz
"resembled" one of the two robbers, though none could
identify him with any certainty. According to the testi-
mony, identification was complicated by the fact that the
three Cruz brothers bore a strong family resemblance.
However, defendant by his oral confession supplied this
important link in the chain of evidence when he ad-
mitted to being in the store and stated that he and Vigil
"put the people in the cooler" and "I made them open
the safe." The fact that he later changed his story and
upon trial repudiated the truthfulness of the confession
(though he still admitted making it) presented for deter-
mination by the jury the issue as to *when* he was telling
the truth. Moreover, there is compelling circumstantial

evidence that logically tends to connect this particular defendant with the robbery. He was discovered hiding under some loose insulation in the attic of the house where the others were apprehended, with the guns identified as those used by the robbers close at hand, and, also in close proximity to him, a paper sack containing currency and coin answering the general description and denomination of that taken in the holdup. No one else was in the attic. Suffice it to say, there was ample evidence to carry the case to the jury.

It is next urged that the trial court erred in instructing the jury as to the statutory definition of an accessory, "because no evidence was offered to show that the defendant had any knowledge of the commission of the robbery." This objection is neutralized by the defendant himself, who, as we have shown, stated in his oral confession that he not only had knowledge of the robbery, but actually participated therein. The propriety of an instruction on the law of accessory, when two or more persons are jointly engaged in the commission of a crime, is specifically approved in *Schreiner v. People*, 146 Colo. 19, 360 P. (2d) 443. It was there stated that: "Where, as here, two persons are acting in concert, one holding the victim at bay, the other emptying a cash register, an instruction on accessory is in order."

The trial court committed no error in refusing to strike the testimony of the witnesses, Krupa, Ekler and Wilkerson, as to their individual conversation with the robbers. This assignment is predicated on the assumption that there was no evidence to establish that this defendant was one of the two robbers who entered the store. As already pointed out, the defendant in his oral confession supplied the necessary link in the chain of evidence to identify him as one of the principal actors. Therefore, this testimony was not subject to the objection that it was hearsay.

Defendant's contention that it was error to in-

struct the jury as to the legal significance of his possession of goods and moneys recently taken by force from the Lake Shore Super Market is without merit. He concedes the propriety of such an instruction in a burglary or larceny case, but contends it is not proper in a robbery case. No authority is cited in support of this attempted distinction. In 46 Am. Jur. Robbery §48, p. 160, it is said: "When a proper foundation has been laid, evidence that the property taken in the robbery in question was * * * found in the possession of the accused shortly thereafter is admissible against him, in accordance with and subject to the rules governing the admissibility of evidence of the possession of the fruits of crime generally." There was no error in instructing the jury on this matter, even though the charge was robbery and not larceny.

Although no objection was made in the trial court to the form of the instruction, defendant argues here that the instruction was misleading and erroneously tends to place a burden of proof on the defendant. The particular instruction, while perhaps not a model of legal clarity, is nevertheless not subject to the defect urged by the defendant. See *Ciccarelli v. People,* 147 Colo. 413, 364 P. (2d) 368, where an instruction of the general type given in the instant case was carefully analyzed and determined not to constitute reversible error.

█ Without objection the trial court gave an instruction on circumstantial evidence. In his motion for a new trial defendant did not predicate error on the giving of such an instruction. Here for the first time defendant attacks the instruction, claiming it is unclear and misleading. Our review is essentially limited to issues presented in the motion for a new trial, subject to our discretion to consider matters even though not properly raised, when the justice of the case requires it. Suffice it to say that nothing in the record here calls for the exercise of that discretion. No constitutional right of this defendant is violated by our declining to consider his

belated attack on the instruction relating to circumstantial evidence. See *Perry v. People,* 116 Colo. 440, 181 P. (2d) 439, and *Dickson v. People,* 82 Colo. 233, 259 Pac. 1038.

In his *reply* brief defendant for the *first* time argues that there has never yet been a determination by a jury of the issue raised by his insanity plea, and that this requires a reversal. Though this point has not been properly presented and could accordingly be disregarded, we prefer to consider the matter on its merits. At first blush it might appear that defendant's constitutional right to a trial by jury on the issue of insanity has been abridged, but careful examination of the record convinces us that such is not the case.

Defendant pled insanity, along with his general plea of not guilty, in the manner and form prescribed by statute. This plea was never formally withdrawn, though in practical effect it was abandoned. C.R.S. '53 (Supp.), 39-8-3, permits the trial court in its discretion to "set for trial the insanity issue alone." This was not done in the instant case, and the only alternative provided by this statute is "one trial upon all issues raised by all pleas entered." Upon trial neither the People nor this defendant offered any evidence even remotely related to the issue raised by the plea of insanity. Nevertheless, defendant, had he so desired, was entitled to have appropriate forms of verdict on this issue submitted to the jury. See *Mundy v. People,* 105 Colo. 547, 100 P. (2d) 584. However, in the instant case, the record is quite clear that counsel for defendant after examining the proposed forms of verdict in just so many words stated: "I have examined the verdicts and have no objection thereto." Nor did he tender any additional forms of verdicts. In this state of the record defendant cannot successfully predicate error on the failure of the trial court to submit a form of verdict on the issue raised by the insanity plea. Defendant cannot blow hot and cold in such matters. He may not at the trial court level spe-

cifically approve the forms of verdicts and fail to tender any appropriate additional ones, and then in this Court urge that other or additional forms should have been submitted. Fortunately, this type of a boot strap operation finds no sanction in the law.

The judgment is affirmed.

Mr. Justice Day not participating.